I'd like to reserve four minutes for rebuttal if I may. You may, please proceed. The orders under review, and particularly the reconsideration order, have significant problems underlined by some of the concessions made by the FCC on brief that sort of evince the typical problems that this court often finds warrant reversal of an administrative order. For example, on the reconsideration order, the commission ruled that every requirement contained in a cable franchise counts against the franchise fee unless it falls within one of the four exceptions to the definition of a franchise fee in the cable act. At the same time, in the second order, the commission endorsed a decision made by the media bureau in the city of Bowie that said precisely the opposite, that as a general matter, franchise fee requirements do not count against the franchise fee, and it was very explicit on that in the city of Bowie letter. There's no explanation or even a recognition of the conflict between the positions the commission has historically taken and the position it's taken in this order. And there you're referring to the inclusion of cable service related, I'm thinking of the term exactions, including those as part of the 5% franchise fee cap. Right. It's treating every cable related regulatory requirement as a franchise fee. Whereas in your view, in the first order, they only counted non-cable service related exactions as part of the 5%. Is that, am I understanding correctly? Right. Or non-cable related. They may not be directly related to cable service, but they'd be related to the cable system or the cable system's operation. Institutional networks being an example of something that was recognized that could be contributions, could be required, but that difference between cable related requirements and non-cable related requirements is significant, and it's significant in the statute, because the statute prohibits enforcement of non-cable related requirements in a franchise, specifically. Yes. You only have 15 minutes. You really raised five issues. They seem to have varying importance and weights here. So, would you mind telling us how you weight these five different claims that you're bringing, and which ones do you want to talk about this morning? I'd like to focus on the one I just started with, the franchise fee, and I just... The 5% franchise fee cap. The 5% franchise fee cap. What counts for in-kind. So that's number one. And the mixed use provision. All right. Very good. Thank you. Please proceed. The others, just to mention very quickly, the reason the state issue is... We got the other ones. Yeah. The state issues. Well, let me talk about that franchise fee issue, but there really were two concessions on the brief that are important. One was on the state issue, that this ruling does not apply to the state issues. What's the concession real quick? We'll note it. Yeah. That the rulings do not apply to state franchise, states where the state has a franchising law. And the contradiction was, the Hobbs Act, the order, the commission said, but the Hobbs Act will require courts to apply the order, not with state. We know that. Okay. We got that. We got all your arguments on that. Let me focus on the fee issue. Basically, the fee requirement is pretty astounding when you look at the basic structure of the act. Something that I think results in, it doesn't even pass muster under Chevron step one, much less two, or the arbitrary and capricious. But you have two aspects of your argument here, right? Number one, you think that franchise fees do not include non-monetary exactions. Is that correct? I don't. That is certainly, that was a petition raised by, I believe, the amicus, that it doesn't include non-monetary exactions. You're not arguing? I certainly think that would be the proper ruling, but based on the ordinary definition of tax fee and assessment, the definition of tax by definition is raising money. You're not arguing that? That was raised by amicus. Our position was, because that related to the extent that it related beyond, I'm sorry, let me restate that. We certainly believe that's the case. Our focus ... Is it an issue before us or not? It is an issue that's before you, but that issue, I think, was more clearly raised in the first order, and as in contrast to the non-cable related, and that's why we focused on the non-cable related distinction. The question is whether our court decided that particular issue in that appeal. Of the tax fee or assessment, whether tax fee or assessment. I don't think it actually directly did decide that issue. I think that's what ... I gather you personally are not going to be arguing about that non-monetary thing today. I'm not going to ... I will actually ... I'm not going to focus on that. Why don't you talk about what you want to talk about? The structure of the Cable Act, there's several dozen provisions that are designed to determine that say what we can require from a cable operator, how we can require them, and actually establish a process, particularly for incumbent operators, which is who this second order applies to, that requires to go through something like a quasi-trial procedure before we could ever deny a renewal. That includes consideration of community needs and interest. It requires us to establish, to attempt to get an operator to provide the services, facilities, and equipment that meet community related cable needs and interests. It requires us to consider the cost to the operator of doing that. That whole scheme would make no sense if, as the commission said, a requirement is then paid for by the community. If we're paying for it, no operator is going to object to doing it. There's certainly no reason for the federal government to establish a multi-dozen or so provisions, including procedural provisions and court review provisions to determine whether we got our community needs right. We're paying for it. It's not consistent with the commission's order in Bowie, but it's also not consistent with how anyone has operated since the act was adopted. You're only paying for it if you assume that you've already maxed out the 5%. I guess if I was to be a devil's advocate here, I don't mean that pejoratively as to the agency. Maybe your transaction costs, so to speak, are a lot less than 5%, and reasonably there should be plenty of room in there for a reasonable level of these sorts of free and discounted services. What it's encouraging you to do is to be efficient about all these things. Actually, we aren't even talking about the free or discounted services. Any requirements would include things like build-out. Operators are required to build out to areas they don't want to build out to. Construction costs are over $100,000 a mile, so there would be no city where they could afford a build-out requirement if that sort of requirement was treated as in-kind. Remember, the FCC never defined what in-kind was. It does convey a sense of they're giving you something of value, not that necessarily you're building out your own infrastructure to serve a broader geographic area. You can see a difference in-kind, really no pun intended, between them saying, okay, we're going to do all this free stuff for schools, on the one hand, and on the other hand, okay, we're going to build out our network to reach rural areas that really aren't very profitable for us, but we'll do it because you're telling us we need to do it. Those are different in the sense of them conveying value to you, aren't they? I'm not sure they are different, and I think that that failure of the FCC to even explain the difference or what that difference would be between those things is actually a failure under standard review. I suspect that the FCC is going to tell us today that they don't mean what you're suggesting. And if they don't, then the question is, what's the line drawn? Because let's take a senior citizen discount. That serves, as it's been endorsed by the FCC in the Antioch decision, exactly the same function as a build-out requirement. In fact, the Antioch decision explains that the reason you allow senior citizen discounts is so that cable services reach areas of the community and people within the community that would not otherwise be able to get service. These schools are not the government. I mean, governments are often strictly... Let's just back up a little. I mean, we had the first order, which, at least as we construed it in Alliance, says that incidental, that the agency's interpretation of the word incidental, as used in the exception to the franchise fee definition, was reasonable, right? And you say, well, the FCC was only talking about non-cable-related sort of services that the providers might be required to cough up. And now you're saying, okay, they extended it to cable-related services. And so is your argument that now that is no longer a permissible construction of incidental? Or is it an APA argument that this is an arbitrary and capricious application of the definition we already approved? I'm trying to understand statutorily what is the ground. If you look at our briefs, we actually make both those arguments. And I think this goes back to the initial question you asked me. You start off by asking, what is a franchise fee? It's got to be a tax fee or assessment. Those are undefined terms under, I think, your Vanderbilt decision. Those have to be defined in the dictionary. Why is it worse from, let's say, an interpretive standpoint, okay, to say that incidental expenses include or don't include, I'm getting kind of vertigo on this, but why is their interpretation of incidental as extended to these non-cable services, or extended to cable-related services? Why is that less reasonable as a matter of statutory construction step one? You're arguing step one of Chevron on this point, right? Explain to me in an interpretive way why that's less reasonable. They interpret incidental to being small as opposed to related to, which was the argument that was actually before the court in the sixth. They mean small. And what you see in the Cable Act is not anything that is a basic structure that's designed to make sure cable systems meet the needs and interests of the community. That's a basic function, and it's stated right in the purpose of the Act. One can't say, I want to establish regulatory obligations to serve, and at the same time, what I'm going to tell you is you have to pay for those regulatory obligations. That sort of structure makes no sense, and what you do in a regulatory interpretation, as this court has recognized, you've got to look at the Act as a whole and ask, would that sort of interpretation actually lead, or is it consistent with the rest of the structure of the Act? Is there anything in the Act that indicates Congress only wanted us to impose small obligations on operators, whatever that could mean? And I would say to you, there's nothing statutorily. There is simply a mandate for us to help meet local needs and interests. Before you finish, and we'll give you, this is important, we'll give both of you whatever time that you need realistically. Am I right that your essential contention on the subject that we've been talking about is the fact that while the second order and the reconsideration order say that they're following the first order, they deleted those three words, except as discussed below, in the second order, and then they denied in the reconsideration order that there actually was any difference. And that, whatever the import is, is what seeds this confusion that you're arguing about here today. I just want to focus in on, with the government's attorney, when we get to her in a minute, that that's what is the root cause of all of this. I was actually an attorney on the first case for a small group, and I can tell you that what affected me was the representation of the commission to this court during a motion for stay that in kind did not apply to cable-related matters. Once I saw that, I wasn't going to come to this court and argue, oh, the commission's been sloppy in its language. The commission, with all due respect, is often sloppy in its language. But the question here is now, they've applied it in a way, they've now taken what they said before and essentially did reverse it. And they've essentially expanded it beyond what the statute can bear. The reason... So the answer to my question is yes or no? Yeah. The answer to your question is yes. They've expanded it beyond what it can bear. Now, do you want to talk about mixed use also? Yes. Let me just say... Before you move on, in the remedy you're asking for, is it a remand for clarification as to the position? Is that it? As opposed to reversal? I think you can reverse on this one, because under Chevron, I think you can find that the ruling insofar as it applies to cable-related matters isn't consistent with the plain language of the statute. And it's certainly not a permissible reading of the statute under either Chevron or the arbitrary and capricious standards. What would be the difference between those two outcomes, a remand versus a reversal? I think on a remand... If we reverse... Excuse me. I'm sorry. If we remand, they can go back and allegedly some administrative procedure to clarify what they really meant here, right? If we reverse, then they've got to start over with a new rulemaking proceeding, don't they? If you find under Chevron that the language... If you find under Chevron step one that the language does not support the idea that cable-related matters can be treated as franchise fees as a whole cloth, I think that to the extent they want to reverse the issue, it'll be a very different rulemaking than if you simply send it back to them for further clarification. I'm not sure if I... So the import I'm guessing is that if we reversed and said that that rulemaking procedure was improper, then you could continue to be doing what you're doing for however long it would take a new rulemaking to be instituted. So as a practical matter, you're better off with a reversal because they have to start over. That's right. And if it... And they would say they're better off with a remand because they can bring incumbents and new entrants into the same system, which is a matter of fairness, they can do that faster. Do I basically discern the two competing objectives here? I think that's right. I think on remand, the one reason, and I hate to argue against myself, the one reason for remand would be on the tax fee or assessment issue to recognize that they never really did confront what those plain language terms meant. It was never discussed in the first order. Well, there are two different issues. There are two different issues, yeah. The reality is if we remand for reconsideration or clarification, we're going to probably get the case back as opposed to ruling at this point where we might at least resolve one of the issues. Yeah. If the non-cable related issue is resolved, they may never... I can't say that the FCC would... If you rule for us that cable related are not franchise fees, I'm not sure there would be a follow-up proceeding. There might be, but there'd certainly be no guarantee of that. Mixed use. Mixed use, yeah. Mixed use. Five minutes to talk about mixed use, then we'll extend the time for the government. The key point on mixed use is that on its brief, the FCC makes a concession that the act allows us to require institutional networks, which since 1984, we've recognized... Isn't there a statutory provision that speaks to those specifically? There is a statutory provision that speaks to that very specifically, but the generalized ruling in the second order was we can't regulate anything with respect to mixed use facilities that's not video programming related. That's just... Normally, we don't like the parties to repeat the basics, but on this one, the deal here is the second order says that the local franchising authorities cannot regulate cable providers to the extent they're providing non-cable services. The extent they... Right. And I think it may use the term video programming services. I may be mistaken, but I believe it's video programming services they refer to. Okay. Which is actually... That's... And certainly, the INET is one reason why... The INET... You realize when you quibble with each one of these words, there's no way you're going to get your argument out in five minutes? I won't quibble with each. I apologize. I gather you have, once again, a Chevron step one and also an APA argument as to this? Correct. And give me your Chevron step one again. The INET's the obvious Chevron step one. But they're saying the INET... This sort of works around the INET. It obviously doesn't apply to the INET, because it speaks to that directly. But apart from the INET, you can't do this stuff. Okay. So then you look at section 544B, which says that we may enforce any requirement contained in a franchise for video programming or for other services, and the section before that says we can't establish a requirement, that is, we can't demand that the operator propose something with respect to video programming or other services, but that uses the actual term information services. And information services are not cable services. There's something in addition to cable services. What section is that? 544B. That's the one that says information services? It uses the term information services. You would say, well, the statute indicates that we can regulate information services. That goes beyond cable services, ergo, it anticipates this broader regulation. That's correct. And in the same section it refers to, where it wants to refer to cable services, it actually uses that term specifically, 544H. There's also a provision that says we cannot regulate telecommunication services. That would be completely unnecessary, be subplurful of us, if the act didn't generally allow us to go beyond cable services. What section is that? I believe that's 522, and I think it's, see, I can check that while we're waiting. Sorry, it's close enough. The section 551, the privacy provisions, the FCC has read that to apply to services beyond cable services, and 551 contains a specific provision that says localities may adopt regulations with respect to privacy consistent with this section. But you're okay with the commission saying that you cannot regulate, tell me if I'm getting the terminology wrong, Title II carriers to the extent they're providing non-cable services? I cannot regulate Title II, I cannot regulate a Title II carrier to the extent it's providing telecommunication services. I cannot regulate a Title II facility except to the extent it's being used to provide cable services. The law actually distinguishes, in the definition of cable system, the exception is for Title II facilities, which would be facilities established pursuant to section 214 of the act, not every facility. Non-cable, non-common carrier facilities can be used to carry common carrier traffic, that happens all the time, and the FCC has recognized that. But the distinction that was made in the first order, based on the first order, was we can't use our cable service authority to begin to regulate Title II facilities, and we have no problem with that at all. Okay. Could I go back to just a basic for a moment before we leave this item and hear from the government? When I got done reading all of this, it seemed to me your main focus was these INETs, and that when I read the commission's response, they actually don't disagree with you on the question of INETs. So then under this whole mixed-use section of these pleadings, I was left to wonder, what's left? What's left that you are actually arguing about? So it must be some sort of non-cable services that are not INETs. Yeah, and I think... So what is that, that you are still arguing about? Or it would be wonderful if you said, well, with their concession, you don't have a problem. With their concession, we actually talked about this. Their concession act takes care of 90 percent of our problem, and I'd love to say the other 10 percent doesn't matter. Tell us in just a quick nutshell, what does the 10 percent consist of? There are a lot of services that are being provided called, quote, over-the-top like television services that are video services. They look just like cable services, but their classification is unknown right now. They're clearly not telecommunication services. But if an operator is provided, we're seeing more and more operators begin to use new technologies to deliver the same services into the home. So if the Cable Act says we get to regulate the facility, that allows us to respond to changes in technology. If it limits us to doing classic cable service, then some of the changes in technology we will not be able to respond to. So you, in that example, would want to be able to regulate TV being directed to the home as opposed to cable, assuming somebody knows what the difference is there. And they say you shouldn't be able to regulate that. They say, right. Well, literally we have a void where the Commission has a pending rulemaking to determine whether things that are delivered using Internet protocol, not Internet, but using Internet protocol, are cable services. Why isn't that the better place to be resolving what you say is this additional 10 percent that's new over-the-top stuff? Because whether or not it's cable service, if to use it, and I don't mean to insult the company, but if Comcast is delivering cable service and something called an IP service that looks identical, our argument would be it probably should be subject to the same rules. And unless the Cable Act prohibits us from regulating it, we can deal with it. We don't have to wait for the FCC to classify it in order to regulate it. Under the FCC's rule, our ability to act depends on a classification rule they may or may not issue. Are you saying you want to be able to regulate based on the type of facility rather than the type of service? We want to be able to regulate based on the type of facility, the cable system. And we want to be able to regulate services other than telecommunication services that are provided via that facility. So you'd have cable. Is that a yes to my question? Yes. So you'd have cable. You wouldn't have telephone. And you would have whatever's left? Whatever's left, yes. And that's the information services, actually, category when you get right down to it. Most of the information category is in the INET, at least what you're worried about. Okay. Okay. Thank you. May it please the Court, my name is Maureen Flood. I'm here this morning on behalf of the Federal Communications Commission. Before I get started with my presentation, I want to rebut a point that opposing counsel made. He argued that had he known that the first report in order covered cable-related, in-kind contributions, he would have briefed that issue. And that underscores his point that the Commission somehow extended the first report in order's ruling in the second report in order. I want to read to you from Petitioner's brief when they challenged the first report in order before this Court and Alliance for Community Media. If you look at the appendix at page 449 and 450, the section is headed, cable service to government buildings and other in-kind services are not franchise fees under the Act. Which is the argument that he's making today. So in terms of responding to his franchise... But that said, you did tell this Court, didn't you, in Alliance, that mandates for free or discounted cable services would not count against the 5%. We did, and that was a mistake. It was in our state papers. It was not in there. It's great. It was not in there. Okay, but I mean, here's the way it normally works in litigation. If you make a representation to the Court in the course of seeking an order from the Court, and you get that order, you are stuck with that representation per judicial estoppel throughout the litigation. But, Your Honor, what happened here was the Commission did not make that misrepresentation in its brief. And in fact, Petitioner's brief... You... It doesn't... You're... You're saying... That... You guys... This was a stay motion. I forget who filed it. Somebody filed a motion, probably the other side, to stay the effect of your, I guess, first order, right, during the pendency of the Alliance appeal. And that motion was brought to us, right? Right. I agree with that, Your Honor. But if Petitioner's understood, based on that stay motion, that our order did not apply to... I understand what you're saying. Why would they make this argument? I'm not talking about his conduct or their conduct. I'm talking about the Commission's in telling this court, hey, you should not stay the effect of the first order because the first order does not treat non... It does not treat cable service kind of, you know, exactions towards the 5% cap. So let this order take effect. And we say, you know what? Okay, fine. We'll let it take effect. Your Honor, this point really goes to our issue preclusion argument, and the Commission still wins under the APA. Because our... I guess I'm a bit concerned about the Commission's, it seems, in their brief, rather blithe dismissal of the point that the Commission told us in seeking an order, which it got in the first appeal, that this cap include, did not include something that the Commission now says it does include. Well, Your Honor, again, that goes back to the stay papers, but if you actually read the first... Yeah. Filed with this court. The first report and order is reasonably read to apply the... I guess you don't care about that. No, I don't care about that, Your Honor. So how are we supposed to sort of reconcile? Is it just you can just sort of impugn it? I mean, why isn't that subject to judicial estoppel? That's exactly how the doctrine works. I don't believe the doctrine works that way, Your Honor, because the Commission... Really? I don't believe so, because the Commission in its merits brief did not make that argument. It doesn't matter. It doesn't matter.  That's not the case. Your Honor, you... Do either of you think that you either ultimately win or lose? You started on a very curious way this morning when we got a lot to talk about. You said, I want to address his statement that he would have briefed something differently. Who cares? I would say, unless you two think this is somehow dispositive, let's get to the 5% franchise fee and then we'll give you five minutes on mixed use. I totally agree with you, because my view is that the issue that I originally raised goes to our issue preclusion argument, but I think we win without the issue preclusion argument. So thank you, Judge McKay. It gives me an opportunity to talk about the merits. Well, I'm not suggesting that Judge Ketlet should or shouldn't be pursuing that. No, I agree, but I would like to talk about the merits. It seems to me that what the Commission is doing here is saying on this issue that the from the First Order. So then we're trying to figure out what difference that omission means. So then you're going to clear this up seven years later in the reconsideration when you double down on saying the Second Order didn't change the First Order. Would you please allow us to finish our questions before you jump in? I know you're frustrated and we are too. Oh, no. I'm just anxious. That's good. Anxious is good. When marshaled. So explain why that what seems to be a clear change in language, i.e. it didn't repeat those three words that then refer us to a whole other section. Why isn't that a change that is then not explained because you double down in the reconsideration order and say there isn't any difference? Your Honor, in the First Report and Order, the Commission in paragraphs 99 through 104 interpreted the incidental exception in section 622G2D of the Cable Act and what that section provides is that charges and requirements that are incidental to awarding, administering and enforcing a franchise are not franchise fees. The only reasonable way to interpret that language is that charges and requirements associated with awarding and enforcing a franchise are part of the franchise fee. Otherwise that incidental exception makes no sense. Now in paragraph 104 of the order, we identified several examples of non-incidental charges and requirements that do not fall under the incidental exception and thus count towards the franchise fee cap. One of those was free or discounted services provided to a local franchising authority. In paragraph 104, we were clearly referring to cable-related in-kind contributions because that section appears in a part of the order entitled, or that sentence appears in a section of the order entitled, charges that are incidental to awarding and enforcing a franchise. Now petitioners are arguing that at the end of that sentence, at the end of the list of examples, when we talk about in-kind contributions as discussed below, those are the only in-kind contributions covered. Those non-cable in-kind contributions discussed in the next section. But if that's the case, the example of free or discounted services provided to a local franchising authority would be superfluous. Now they go on to argue in their reply brief that, as discussed below, modifies every example in that sentence. But that doesn't make any sense because one of the other examples in that sentence are application and processing fees. Well those are clearly cable-related and they would fall outside the ruling in paragraph 104. Right now you're arguing that the commission reasonably construed its first order when it issued its second. I think that Mr. Van Eaten is also arguing, he's making a Chevron step one argument on this point. And he's saying that when you look at the structure of this act as a whole, it simply makes no sense to say that cable-related obligations in the franchise agreement, if that's the as the franchise fee for the 5% cap. But Your Honor. You heard him make that argument. I heard him make that argument. This Court and Alliance for Community Media rejected that argument. And the reason. Let's talk about, you want to talk about the merits? Let's talk about the merits. Let's not talk about raised judicata right now. I'd like an answer to the question I asked rather than an argument about raised judicata. That is an unreasonable reading of the statute because it renders the cap on franchise fees meaningless. If a local franchising authority could require a cable operator to pay a 5% franchise fee and then require the cable operator to provide unlimited in-kind contributions over and above the franchise fee in lieu of monetary payments, there no longer is a statutory cap on franchise fees. Now the Commission and Congress are not telling local franchising authorities that they cannot impose franchise obligations that are expressly provided for in the Cable Act. PEG access is a good one. INETs under Section 611, that's another one. All the Cable Act says is that when a local franchising authority imposes one of those obligations, the value of that obligation has to count against the franchise fee. And that's captured in the incidental exception in 622G2D where it talks about the only charges and requirements that don't count against the franchise fee cap are those that are in the incidental exception. What's the scope of what you're saying is captured as part of the franchise fee? I mean, obviously Mr. Van Eaton has a concern that things more like perhaps build-out requirements and less like PEG are being counted as part of the franchise fee. What's your understanding of that scope? Well, again, I think the scope is defined by the statute. So if you look at Section 622G1, it defines a franchise fee in very broad terms to include any tax fee or assessment of any kind. But the limitation is posed when it says imposed by a franchising authority or other government entity on a cable operator, subscriber, or bothly because of their status as such. So for example, a build-out obligation or simply the cable operator's operating cost, those aren't imposed by the franchising authority as part of the franchise obligations. Similarly, rate regulation. Can you explain that? Because it's not so the term franchise fee only includes, it's a tax fee or assessment of any kind imposed by the franchising authority. You know, a cable operator's costs of doing business are not imposed. Well, but I think when he talks about the build-out requirements, aren't we talking about instances where the provider really doesn't want to expand its service because it's just not very profitable to extend the lines a long ways to reach just a handful of people. But the LFA might say, well, you have to do that anyway because we want those folks to have service. Your Honor, there was an evidence in the record of that. In talking to our media bureau, that's often not the case. But let me address that specific situation. But that is, but that, let me just, you've got to let us finish, okay? I'm sorry. That is something, at least conceivably, that would be imposed by the LFA in that instance, right? It would be imposed by the local franchising authority. But where other provisions in the Cable Act allow the local franchising authority to regulate rates, to impose build-out requirements, and so forth, that would not be part of the franchise agreement. Now let me also say that the way we read franchise fee in Section 622G1 is to hold that if it's something that's permissible under the Cable Act but is not expressly provided for, it's not a situation, other provisions of the Act say local franchising authorities can regulate rates or impose build-out obligations. The franchise fee really covers those sort of voluntary commitments made by the cable operator and not its compliance with issues that are statutorily mandated. Now really this goes back to paragraph 104 of the first report in order. Because in the second report in order, all we did was extend the franchise fee rulings in the first report to the second report in order. So if you disagree with that framework, that's a framework that we imported from the first report in order. Let me stop you with the framework so I make sure I see where this is going, okay? In the second order that you say is extending the first order, the end result is, if I understand this right, that all in-kind payments have to count towards the fee cap, right? Correct. Now if we go back to the first order, the first order says, it refers to all in-kind payments or services. But then it modifies that by saying, or discuss below, right? I agree in part. It says... Well, that's what it says. How can you disagree with that? I'm talking... Well, it says... The word says, and dot, dot, dot, in-kind payments or services as discussed below. I agree with that. Now, when I go to as discussed below, it then says that any requests for in-kind contributions made by LFAs that are unrelated to the provision of cable services are subject to the statutory 5% franchise fee cap. Correct. That's what it says, right? So it just seems, at least logically speaking, that the negative inference from that is that things that are related to the provision of cable services are not subject to that. Why is that not a reasonable construction of that? Because, Your Honor, as we explain in our brief, the same sentence, right? The sentence ends with, and in-kind contributions as, or in-kind payments as discussed below. That's the end of the sentence. Earlier in the sentence, the commission gives examples of several different types of requirements and charges that don't fall under the incidental exception. But all of those examples are ones that are unrelated to the provision of cable services. Your Honor, in that same sentence, it lists free or discounted services. And because that paragraph appears in a section of the order entitled charges that are related to enforcing and awarding in the franchise, free or discounted services in that context are referring to free or discounted cable services. So the answer to the question is the reason why these orders are consistent is, and it's not affected by the omission of this language, is because of one of the three examples that were employed in the first order from which the reader would have then known that any in-kind payments related to cable services are also subject to the franchise fee. Absolutely. Is that the answer? That is the answer. Because if Petitioner's right. I understand that. Let me just say, that makes no sense to me whatsoever. So my hope would be, just take a couple minutes to tell me why you're right and I'm wrong. And then, unless somebody else has any questions, move on to mixed use. This seems to me the reason probably why you guys said in your motion to stay brief that it means just what he said it means. It's not a coincidence. So your honor, free or discounted services would be rendered superfluous if it meant the same thing as in-kind payments as discussed below. If all in-kind contributions were covered by paragraph 105, which refers to non-cable in-kind contributions, there would be no need to put free or discounted services in that sentence. And in fact, every other example in that sentence is cable related. We talk about application and processing fees, right? Application and processing fees are clearly cable related. The sentence ends with in-kind payments as discussed below because it's trying to distinguish those in-kind contributions from free or discounted services, which in context clearly are cable related. Every example in that sentence is related to the provision of cable service. And that paragraph appears in a section about cable related charges and requirements. So arguably- You do agree that you don't define in-kind. I can't find a definition of in-kind. That's correct, your honor. That is correct. The closest we get to it is what I would say are these illustrative examples. So you say that is an adequate way to put the world and the LFAs on notice that you're regulating cable related services and they count towards the 5%. And you've done that all along. I mean, you meant that all along. We did mean that all along and I think we find- So why did you take seven years on this reconsideration to tell us that? This just doesn't make any sense. What were you doing all that time? You know, I don't have a good response to that question. All I can say is this. When the leadership of the agency changes, the agency's priorities change and unfortunately the priorities change and we should have responded to this sooner. I mean- Fair enough. That's probably the most candid thing we've heard from anybody all day today. We should have acted sooner. Absolutely. And then we did. But going back to this, you know, I'd like to point out- So just out of curiosity, to the best of your knowledge, have then LFAs been in violation of what they charge in the 5% going all the way back to the first order because they didn't understand what you just said? No, Your Honor. I think that they understood what we said in the first order. They've just been doing it in violation of the order contumaciously. Your Honor, this is a matter of statutory interpretation and until the first report in order, the commission never defined the scope of franchise fee. We didn't feel the need to do so because it wasn't until about 2006 the new entrants were coming into the video services market and that's why we interpret it this way. You know, on this point about what were we actually referring to in the first report in order, you know, if you look at this Court's decision in Alliance for Community Media at free or discounted services provided to a local franchising authority and then says likewise any requests made by local franchising authorities that are unrelated to the provision of cable services by a new competitive entrant, that both of those are subject to the statutory cap. So this kind of goes back to my point that when you read paragraph 104, paragraph 104 when it talks about free or discounted services provided to a local franchising authority, those are cable services and that's distinct from non-related entrant contributions. That assumes going back to your conversation with Judge Kethledge that when the Court drafted that order in Alliance that they weren't relying upon what you told them before which was something the opposite. They're citing JA 539 and query whether that's your brief but maybe not. All right, I think we, I'm not sure what more we can do on this one. Do you want to spend some time on mixed use? No, I don't think it's necessary though. I think she's out of time. She is out of time. I know but it's a hard case. Unless you guys have some questions. I do. All right, take two or three or five minutes to talk about mixed use. Be succinct if you would please and then let Judge Kethledge ask you what he wants to ask you about that. Is that fair? So our ruling in the second reporting order on mixed use networks was simply an extension of our ruling in the first reporting order and that ruling was based on the interpretation of cable system in section 602.7c of the act. And in interpreting that provision we found that it didn't distinguish between incumbent cable operators and telecommunications. So if you can just tell us again what you did in the first order based on that provision. Sure. And then how you extended it to. Sure. So in the first reporting order we interpret, so cable system in section 602.7c holds that facility of a common carrier used to provide telecommunications services is not part of a cable system. So in the first reporting order the commission said that facilities that carry non-cable services are off limits to local franchising authorities because they're not part of the cable system. Facilities. That's correct. It was a mixed use network ruling. So we extended that same holding to incumbent cable operators in the second reporting order because we found that the definition of cable system did not differentiate between, excuse me, telecommunications carriers and cable operators. Now when Mr. Van Neaten comes up here and says that facilities are regulated based on the classification of a carrier, he is absolutely wrong and that is in conflict with the Fourth Circuit's decision in media one group which we cite at page 34. Let me ask you this question. Title II facilities, are those, is that a term of art referring to facilities that are established pursuant to section 214a? No, your honor. So the way the communications act, that's incorrect. The way the communications act is structured is to regulate facilities according to the services provided across them. So we've already established when a facility in a cable network carries telecommunications services, it's a telecommunications facility and that's because telecommunications in section 346 of the communications act defines telecommunications services as the offering of telecommunications to the public for a fee regardless of the facilities used. So when a cable operator uses a facility in its system to provide telecommunications services, it's not part of the cable system and it's off limits to the local franchising authority. So the way that we interpret the act, the classification of a facility doesn't depend on the classification of the owner when the facility was deployed. It's based on the services running across it. We also read the cable act to restrict cable operators to regulating cable services and the facilities used to provide those services unless expressly prohibited to regulate mixed use facilities. And a good example are INETs. We agree with INETs that our mixed use network rulings did not undercut their authority to mandate and regulate INETs. But what we don't agree with is that somehow their limited authority over INETs allows them broad authority over information services. Again, go back to the fact that our ruling in the first report in order was that under the definition of cable system, cable franchising authorities cannot regulate the facilities used to provide non-cable services, all non-cable services, not just telecommunications services. All we did is extend that in the second report in order. So to find this information services exception that he's looking for, you would have to effectively overrule the mixed use network ruling in the first report in order. In your world, is there some way that you all know the difference between the information services that are provided in an INET and other information services that apparently is the 10% you're remaining fighting about? It's more about the facilities. They can provide information services, whatever they may be, according to an INET, because they have expressed statutory authority to require an INET. What they want to do is regulate... Just asking how you tell the difference. In your world, can you tell the difference? You don't tell the difference between the service. You tell the difference between the facilities. Some facilities can carry information services, other facilities can't. Got it. I don't have it at all, but I'm basically saying I'm good. Thank you. Thank you. Let me redress the mixed use first and then go to the other. I refer you to AT&T VFCC. We cited that in our case. In our briefs, that's 572 F2-17. Basically, that recognizes that non-Title II facilities, Title II facilities are subject to regulation as common carrier facilities, can be used to carry telecommunication services. Here's what I'm hoping that you'll drill down to. You want us to say that facility of a common carrier, which is what the act says, means a Title II facility. I'm having trouble finding why that's true. It seems counterintuitive under the act. It says a facility of a common carrier is subject to Title II. When you look at the FCC's first order, it refers to local exchange facilities. It actually refers to Title II facilities. The facilities of a common carrier subject to Title II, I read the subject to Title II as qualifying the facility, not the common carrier. Common carriers are by definition subject to Title II. The subject to Title II must refer to the facility. That's how it was referred to in the original order. What statutory provision are you referring to? The definition I think he's reading, I think it says a facility of a common carrier subject to Title II. That's in the definition of cable system. I don't have it in front of me or I'd quote it to you. But I think it's a facility. What the act I think is meant to do is keep us from controlling the telephone company facility. Remember when this was written, cable companies were leasing capacity from telephone systems to provide cable service. So in the context of the time, it made sense as a way to prevent us from allowing us to regulate the cable service, whatever was being used for cable service without extending that into an area over a Title II facility that would be subject either to the state or to the federal government. What doesn't make sense is to say, I'm now going to extend that to any service other than cable service. I'm going to extend the facilities being used to provide other services. It's not subject to your regulation. There's no way you can get to that point from that exception. And by the way, these companies don't consider, we have record evidence that these companies, we submitted records saying these companies who own the cable systems aren't common carriers. They aren't registered as common carriers in any state. They have subsidiaries that provide services that are common carrier services that flow over their network. So they don't consider them to be Title II common carrier facilities and they aren't regulated by the FCC like Title II common carrier systems. So turning on to the... When you're regulating these remaining 10% over the top services, what are you seeking to achieve that you think the FCC is cutting you out of? The ability to extract money or to regulate quality or what? Well, remember the... And I do want to correct one thing. We're not looking to regulate information services per se. There's a provision in the Cable Act, as I pointed out, that says if the operator agrees to provide a broad category of service, we can enforce it. So if an operator said... If you're not looking to regulate it, then what are we fighting over? Because there are facilities that are going in the right way that we have an interest in controlling pursuant to the franchise agreement to make sure they're built out and we don't end up with discriminatory treatment in the delivery of services across the franchise area. Okay. Anything else you have? No. Anything else you have? No. Fascinating as this is, all good things must come to an end. Thank you. We'll consider it carefully.